[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15268
_____

D.C. Docket No. 3:10-cr-00030-MCR-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus


ROBERT E. BOURLIER,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(May 15, 2013)

Before MARTIN and ANDERSON, Circuit Judges, and VINSON,* District Judge.

---

* Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

PER CURIAM:

Until he was convicted in this case, Appellant Robert Bourlier was a medical doctor licensed by the State of Florida. Here, he appeals his convictions for health care fraud, dispensing controlled substances in violation of the Controlled Substances Act (CSA), and dispensing a controlled substance resulting in death. Mr. Bourlier was charged in a 151-count indictment with twenty counts of health care fraud in violation of 18 U.S.C. §§ 1347(a)(1)–(2), 1349; 128 counts of unlawful dispersal of a controlled substance in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), (b)(1)(D), and (b)(2) and 18 U.S.C. § 2; and two counts of dispensing a controlled substance resulting in death.[1] The government's theory of prosecution for the charges under each statute was essentially the same—that Robert had prescribed unnecessary or excessive quantities of controlled substances without a legitimate medical purpose and outside the usual course of professional practice.

A jury found Robert guilty of 143 of the 150 charged counts. The jury acquitted him of two of the fraud counts and one count of unlawful dispersal. The jury did not reach a verdict as to one fraud count and three unlawful dispersal counts. He was sentenced to a total term of 360 months.

---

[1] Count 151 charged Mr. Bourlier's wife, Victoria Bourlier, with obstruction of justice. Mrs. Bourlier is not a party to this appeal. Even so, because two Bourliers were prosecuted, we will refer to Mr. Bourlier as Robert.

2

In his direct appeal, Robert argues: (1) that there was insufficient evidence to support the convictions; (2) that the district court erred by admitting death certificates related to uncharged patient deaths into evidence; and (3) that the district court erred by declining to give certain jury instructions proposed by Robert.

## I.    SUFFICIENCY OF THE EVIDENCE

Robert's first argument on appeal is that there was insufficient evidence to support his convictions. He makes several claims in support of this argument. First, he argues that the government only proved that he was a bad or reckless doctor. He suggests that his practice was merely "sloppy" because he has multiple sclerosis. Second, he argues that the court improperly allowed the jury to find "guilt by association or as a result of a pattern." Third, he argues that the evidence was insufficient because the government never established the appropriate standard of care and how much he deviated from that standard.

This Court reviews a challenge to the sufficiency of the evidence de novo, viewing the evidence and making all reasonable inferences in the light most favorable to the government. United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir. 2005). We must affirm the convictions "unless, under no reasonable construction of the evidence, could the jury have found the appellants guilty beyond a reasonable doubt." Id.

"[A]lthough [Robert] was convicted of both substantive fraud counts and dispensing controlled substances counts, the convictions are inextricably intertwined . . . .  Thus, we evaluate the sufficiency of the evidence for the fraud and dispensing counts together . . . focusing upon the requirements under the CSA."  United States v. Ignasiak, 667 F.3d 1217, 1227 (11th Cir. 2012).  To convict a physician licensed to prescribe controlled substances, such as Robert, under § 841 "it [is] incumbent upon the government to prove that he dispensed controlled substances for other than legitimate medical purposes in the usual course of professional practice, and that he did so knowingly and intentionally."  Id. at 1228 (quotation marks omitted); see also United States v. Tobin, 676 F.3d 1264, 1282 (11th Cir. 2012).

There was ample evidence to support Robert's convictions.  Our precedent establishes that "conduct where an inordinately large quantity of controlled substances was prescribed, . . . large numbers of prescriptions were issued, . . . no physical examination was given, . . . . [and] that [the physician] knew or should have known that his patients were misusing their prescriptions" suggests that a defendant distributed a prescription without a legitimate medical purpose and outside the usual course of professional practice.  United States v. Joseph, 709 F.3d 1082, 1104 (11th Cir. 2013) (quotation marks and alterations omitted).  There was evidence that Robert engaged in this type of conduct.  A Drug Enforcement

4

Administration diversion investigator testified that between 2004 and 2008, Robert wrote 43,051 prescriptions for controlled substances. See Ignasiak, 667 F.3d at 1229 (finding that there was sufficient evidence in part based on the fact the defendant had "written more than 43,000 prescriptions for controlled substances over a five year period"). Also, a pharmacist testified that Robert typically prescribed the same three controlled substances to each patient and rarely prescribed any other medications. An expert who reviewed Robert's files stated that there was scant initial history of the patients and "typically there was no documented evidence of any physical exam being done." The government also pointed to circumstantial evidence that Robert knew or should have known that at least some of his patients were misusing their prescriptions. For example, there was evidence that "patients beg[a]n to demonstrate . . . aberrant behavior . . . with their use of their medicines" such as "coming back on . . . multiple episodes early," and that some family members had called Robert's office to ask him to stop writing prescriptions to addicted patients.

Our review of the record also reveals other evidence supporting Robert's convictions. For example, there was evidence that he continued to prescribe controlled substances to patients he knew had experienced withdrawal symptoms or who had overdosed in the past. Cf. Ignasiak, 667 F.3d at 1223 (noting, as a positive, the fact that the doctor had stopped prescribing controlled substances to a

5

patient who became addicted and almost overdosed).  Robert had a pattern of writing the same prescriptions for different patients, which could support a finding that there was not a "logical relationship between the drugs prescribed and treatment of the condition."  United States v. Rosen, 582 F.2d 1032, 1036 (5th Cir. 1978).[2]

The government also presented an expert in prescribing controlled substances, Dr. Parran.  He reviewed the medical files of patients who were the subject of the indictment, as well as other patient files.  Dr. Parran testified that "the prescribing on [each charged] occasion was done in a way that was inconsistent with the usual course of medical practice and for other than legitimate medical purpose."  Unlike the trial in United States v. Tran Trong Cuong, 18 F.3d 1132 (4th Cir. 1994), which Robert suggests is analogous, Dr. Parran specifically discussed the medical file of each patient charged in the indictment, including those who did not testify, commented on the prescriptions they received, and made individual assessments about their treatment.  See id. at 1141.  "Further, the fact the jury acquitted [Robert] of several counts . . . sufficiently minimizes the risk identified in Cuong that [Robert's] jury merely convicted him based only upon 'guilt by association.'"  Ignasiak, 667 F.3d at 1229 (quoting Cuong, 18 F.3d at 1142).  Certainly the case would have been stronger if Dr. Parran had examined

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding all decisions of the former Fifth Circuit handed down before October 1, 1981.  Id. at 1209.

more of the charged patients or more of the charged patients testified, but we easily conclude there was sufficient evidence to support the jury's guilty verdicts. See id. at 1228–29.

Finally, despite Robert's protests to the contrary, there was also sufficient evidence regarding the appropriate standard of care. For example, Dr. Parran testified generally about the usual course of professional practice. Also, and significantly, the 2002–2011 executive director for the Florida Board of Medicine told the jury about the Florida Statutes that authorized physicians to prescribe controlled substances and set out the standard of care. He testified as well as to the Florida Board of Medicine's rules regarding the prescription of controlled substances. On cross-examination, he read into evidence parts of Florida Administrative Code Rule 64B8-9.013, which address the use of controlled substances for pain management. From this testimony together with the evidence of Robert's prescribing practices, the jury could have fairly concluded that Robert "prescribed controlled substances not in the usual course of his medical practice and was acting other than for a legitimate medical purpose." Joseph, 709 F.3d at 1103 (quotation marks omitted).

## II.    EVIDENCE OF UNCHARGED DEATHS

Robert's second argument on appeal is that the district court erred by allowing the government to admit evidence of uncharged patient deaths,

7

specifically death certificates for patients Lewis Hassell and Keaan Amaker, a letter from a medical examiner regarding patient Sara McCormick, and related testimony from family members and experts.  Some of the charged unlawful dispersal counts related to Robert's prescriptions for Hassell, Amaker, and McCormick.[3]  Robert objected to the admission of any evidence of uncharged deaths in a Motion in Limine prior to trial, and also during the trial.  The district court overruled each of these objections, but constrained the jury's reliance on this evidence through several limiting instructions.  Robert argues that the admission of the death certificates and medical examiner letter violated his constitutional rights under the Confrontation Clause.  He also asserts violations of the Rules of Evidence.  He says the uncharged deaths were irrelevant under Federal Rule of Evidence 401, unduly prejudicial under Federal Rule of Evidence 403, and improper propensity evidence under Federal Rule of Evidence 404(b).

## A. CONFRONTATION CLAUSE

Under the Confrontation Clause, the government "may not introduce 'testimonial' hearsay against a criminal defendant, regardless of whether such statements are deemed reliable, unless the defendant has an opportunity to cross-examine the declarant, or unless the declarant is unavailable and the defendant had

---

[3] The government also introduced, as 404(b) evidence, evidence regarding the death of one patient—Ms. Frady—who was not part of any charge in the indictment.  Mr. Bourlier does not appear to challenge the introduction of this evidence.

prior opportunity for cross-examination." Ignasiak, 667 F.3d at 1230 (citing

Crawford v. Washington, 541 U.S. 36, 53–54, 68, 124 S. Ct. 1354, 1365–66, 1374

(2004)).

Generally, we review constitutional claims de novo. United States v.

Williams, 527 F.3d 1235, 1239 (11th Cir. 2008). However, if a defendant did not

"lodge a timely Confrontation Clause objection" we review only for plain error.

United States v. Arbolaez, 450 F.3d 1283, 1291 (11th Cir. 2006). "[A]n objection

properly characterized as . . . an evidentiary objection . . . does not constitute a

constitutional objection for purposes of appellate review." United States v. Baker,

432 F.3d 1189, 1206 n.12 (11th Cir. 2005). Thus, for example, "[a] hearsay

objection to testimony at trial, standing alone, does not preserve a constitutional

challenge under the Confrontation Clause for appeal." Arbolaez, 450 F.3d at 1291

n.8.

### 1.  Death Certificates

At the point during the trial that Lewis Hassell's and Keaan Amaker's death

certificates were admitted into evidence, Robert made no Confrontation Clause

objection on the record. The Motion in Limine Robert filed before trial did argue

that evidence of uncharged deaths should be excluded, but based the argument

solely on the Rules of Evidence, as opposed to asserting a constitutional claim.

Similarly, no mention was made of the Confrontation Clause when this evidence

9

was discussed during a bench conference before the death certificates were admitted. Then, no new objections were made when the death certificates were actually admitted into evidence. Indeed, the only place in the record Robert points to as raising a Confrontation Clause issue was after the death certificates had already been admitted. Therefore, Robert did not "lodge a timely Confrontation Clause objection" to the admission of the death certificates and we can only review for plain error. See Arbolaez, 450 F.3d at 1291.

To prevail under plain error review, Robert must show "(1) error, (2) that is plain, and (3) that affects substantial rights." United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005) (quotation marks omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (quotation marks omitted).

Even if we assume that Robert satisfies the first two requirements of the plain error test, he has not shown that the admission of the death certificates "affect[ed] his substantial rights." See id. To satisfy this requirement, Robert must show "a reasonable probability that the result would have been different but for the error" or a "probability sufficient to undermine confidence in the outcome." Id. at 1299, 1301 (quotation marks omitted). Robert has failed in this regard, because even independent of the challenged testimony there was "overwhelming evidence"

10

in support of Robert's convictions. See United States v. Turner, 474 F.3d 1265, 1278 (11th Cir. 2007). We note that there was otherwise admissible evidence in the record to show that Lewis Hassell and Keaan Amaker died during the time they were Robert's patients; the death certificates showed, and it is not disputed, that both Hassell's and Amaker's deaths were not caused entirely by drugs Robert prescribed; and after these certificates were admitted, the district court gave a limiting instruction to the jury, approved by Robert's counsel, explaining that "there [was] no basis upon which [the jury] could find in this case Dr. Bourlier guilty of anything in connection with their deaths."

## 2. Medical Examiner Letter

In contrast to the death certificates, the Sarah McCormick medical examiner letter was admitted after Robert objected to this type of evidence on the grounds that he could not "cross-examine it." Assuming that this was sufficient to preserve the Confrontation Clause claim, and reviewing the issue de novo, we conclude there was no violation of the Confrontation Clause.

The Confrontation Clause applies to "testimonial statements." Davis v. Washington, 547 U.S. 813, 821, 126 S. Ct. 2266, 2273 (2006). We have explained that a statement is testimonial if, for example, considering the statement's "primary purpose" it was "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

11

United States v. Caraballo, 595 F.3d 1214, 1228–29 (11th Cir. 2010) (quotation marks omitted).  Indeed, in every "post-Crawford case in which the [Supreme] Court has found a violation of the confrontation right, the statement at issue had the primary purpose of accusing a targeted individual."  Williams v. Illinois, ___ U.S. ___, ___, 132 S. Ct. 2221, 2243 (2012).

The letter at issue here was from the medical examiner's office and was sent to Robert to request that he provide the examiner with Sara McCormick's medical records as part of the examiner's investigation into her death.  It was simply a request for a patient's records without any accusations.  Because the letter was not "made under circumstances which would lead an objective witness reasonably to believe that [it] would be available for use at a later trial," Caraballo, 595 F.3d at 1228 (quotation marks omitted), and it did not have "the primary purpose of accusing a targeted individual," Williams, 132 S. Ct. at 2243, we find that it was not testimonial.  Thus, the admission of the letter did not violate the Confrontation Clause.

### B.  FEDERAL RULES OF EVIDENCE 401–403 AND 404(b)

Robert challenges the admission of all evidence related to the uncharged deaths, including the death certificates and family members' testimony, stating that it was irrelevant under Rule 401; that the "probative value [was] substantially outweighed by . . . unfair prejudice" under Rule 403; and that it was improper

propensity evidence under Rule 404(b).  We review evidentiary rulings for a clear abuse of discretion.  United States v. Merrill, 513 F.3d 1293, 1301 (11th Cir. 2008).

First addressing Robert's Rule 404(b) argument, we note that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b).  At the same time, evidence of activity is "not extrinsic under Rule 404(b) if it is . . . necessary to complete the story of the crime, or . . . inextricably intertwined with the evidence regarding the charged offense."  United States v. Ramsdale, 61 F.3d 825, 829 (11th Cir. 1995) (quotation marks omitted).

The district court did not abuse its discretion by determining that the evidence of the uncharged deaths was not 404(b) evidence because it was "inextricably intertwined with the offenses charged."  Again, the evidence of death was admitted about patients whose care was the subject of the unlawful prescribing counts.  These patients were receiving controlled substance prescriptions from Robert and died during the time period alleged in these counts of the indictment.

We next consider Robert's arguments that Rules 401and 402 were violated. Rules 401 and 402 provide that only relevant evidence, defined as evidence that "has any tendency to make a fact [of consequence to the action] more or less

13

probable," is admissible.  Fed. R. Evid. 401–02.  These rules reflect a general policy of "liberal admission of evidence."  Allison v. McGhan Med. Corp., 184 F.3d 1300, 1310 (11th Cir. 1999).

The district court did not abuse its discretion by finding this evidence to be relevant.  For example, evidence that Hassell, Amaker, and McCormick had died, foreclosed any idea that the patients stopped receiving prescriptions from Robert because Robert had stopped treating them.  Similarly, evidence of these patients' deaths would have put to rest any idea that they were not called by the government to testify at trial because they only had good things to say about Robert.  Finally, the evidence of these patients' deaths could be considered by the jury when determining whether Robert knew that his patients were misusing his prescriptions.  As we have said, this is one factor that may suggest that Robert distributed controlled substances without a legitimate medical purpose and outside the usual course of professional practice.  See Joseph 709 F.3d at 1104.

Finally, we consider Robert's argument that the probative value of this evidence was "substantially outweighed by . . . unfair prejudice" in violation of Rule 403.  Fed. R. Evid. 403.  Rule 403 is an "extraordinary remedy."  Merrill, 513 F.3d at 1301 (quotation marks omitted).  When reviewing a district court's Rule 403 determination "we look at the evidence in the light most favorable to its

14

admission, maximizing its probative value and minimizing its undue prejudicial impact." Id. (quotation marks omitted).

The district court did not abuse its discretion by finding that any unfair prejudice did not substantially outweigh the probative value of this evidence. See id. We recognize that the evidence of these patient deaths was highly probative. At the same time, we acknowledge that it was prejudicial as well. Our concerns about the prejudice are mitigated, however, by the three jury instructions the district court gave to the jury, see United States v. Mateos, 623 F.3d 1350, 1365 (11th Cir. 2010), as well as the undisputed testimony that other factors besides the drugs prescribed by Robert contributed to each death. Even if we were to accept that the district court did abuse its discretion by admitting this evidence, we can say with "fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error" and that the error was therefore harmless. United States v. Gamory, 635 F.3d 480, 492 (11th Cir. 2011) (quotation marks omitted).

## III.    **JURY INSTRUCTIONS**

Robert's third argument for us is that the district court erred by refusing to give the theory-of-defense instructions he proposed. The proposed instructions purportedly clarified the relevant state standards of care and good faith defense. For example, Robert's proposed instruction nine explained that state standards of

15

care are determined by state statutes, regulations, and medical boards.  Robert's primary argument was that the instructions were necessary to ensure that any conviction was based on state standards of care as opposed to a nonexistent national standard.

"We review a district court's refusal to give a requested jury instruction for abuse of discretion."  United States v. Carrasco, 381 F.3d 1237, 1242 (11th Cir. 2004).  "A district court's refusal to give a requested instruction is reversible error if (1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself."  Id. (quotation marks omitted).

The district court's refusal to give the requested instructions was not an abuse of discretion because the subject matter of several of the rejected instructions was substantially covered by other instructions.  For example, proposed instruction ten explained that reasonable care is based on the standard that was acceptable at the time the physician acted.  The given instruction told the jury that the government must prove beyond a reasonable doubt "[t]hat at the time of the distribution or dispensing," Robert knew that the distribution was "not for a

16

legitimate medical purpose in the usual course of professional practice." (emphasis added).

As for the remaining instructions, Robert has not shown that the "failure to give [them] seriously impaired [his] ability to defend himself." Carrasco, 381 F.3d at 1242. First, the district court gave several instructions relating to the standard of care that have been specifically approved by this Court. For example, the district court repeatedly instructed the jury that Robert was "not charged with medical malpractice or negligence," but was instead charged with "knowingly and intentionally prescribing controlled substances to his patients outside the usual course of professional medical practice." The jury was instructed therefore, that the government had to prove, beyond a reasonable doubt, that Robert knew that he was distributing controlled substances "not for a legitimate medical purpose in the usual course of professional practice." This instruction was in keeping with our guidance in United States v. Williams, 445 F.3d 1302 (11th Cir. 2006) abrogated on other grounds by United States v. Lewis, 492 F.3d 1219 (11th Cir. 2007), that an instruction explaining that the government must prove the doctor dispensed controlled substances "outside the usual course of professional practice . . . properly state[d] the standard by which a [doctor's] conduct must be judged." Id. at 1307–08.

The district court also instructed the jury that a prescription is lawful if it was written "in accordance with the standards . . . generally recognized and accepted in the United States."  This court approved this precise instruction in Joseph.  Joseph, 709 F.3d at 1095.  Therefore, the instructions given were not misleading or improper and "did not suggest that the jury must evaluate the conduct of the defendants against a single national standard of practice."  Id.  Instead, they required the government to prove that Robert's actions "were inconsistent with any accepted standard of professional practice."  Id.

Second, a number of witnesses testified about the usual course of professional practice and at least one expert testified about Florida standards of care.  Thus, the jury was able to consider these standards in determining, for example, whether Robert had prescribed the controlled substances in good faith, which the jury was instructed was a complete defense to the unlawful dispersal counts.  See Joseph, 709 F.3d at 1097 (highlighting the fact that "[e]xperts for both the prosecution and the defense testified about the accepted standard of medical practice").  Third, Robert made no showing that the state standards were materially different than the standards on which the jury were charged.  See id. at 1096 (discussing how, "[e]ven if the district court should have instructed the jury to evaluate the conduct of the defendants against only a Georgia standard of medical practice, the defendants failed to offer any proof that the Georgia standard differs

18

at all from any national standard that the jury purportedly considered"). For these reasons, we find that Robert's ability to present his defense was not "seriously impaired" by the court's failure to give the proposed instructions.

## IV.    CONCLUSION

We **AFFIRM** the rulings of the district court as well as Robert's convictions.

**AFFIRMED.**