NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0387n.06

No. 23-5613

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Sep 13, 2024
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE |
| v. | ) ) | UNITED STATES DISTRICT COURT FOR THE EASTERN |
| DAVID W. SUETHOLZ, | ) ) | DISTRICT OF KENTUCKY |
| Defendant-Appellant. | ) ) | |
| | ) | OPINION |
| | ) | |

Before: GRIFFIN, NALBANDIAN, and BLOOMEKATZ, Circuit Judges.

GRIFFIN, Circuit Judge.

A jury convicted defendant David Suetholz, M.D., of unlawfully prescribing opioids, benzodiazepines, and other controlled substances to patients in violation of 21 U.S.C. § 841. On appeal, Suetholz challenges various aspects of his trial, including the sufficiency of the evidence, jury instructions, evidentiary rulings, and the government's belated disclosure of impeachment evidence. We reject these challenges and affirm his convictions.

I.

A.

Beginning in 1975, defendant David Suetholz practiced medicine in Covington, Kentucky. His prescribing practices eventually came under the scrutiny of the Kentucky Board of Medical Licensure, and an investigation resulted in a 2012 agreed order highlighting problems with his prescribing. By signing that order, Suetholz stipulated that the Board could find that he had

violated Kentucky medical rules that protect against patient harm. He acknowledged the Board's findings that his patient files contained "inadequate documentation" of patients' chronic pain to "support the medical necessity of prescribing controlled substances," and that he failed to adjust prescriptions to account for his patients' problematic behaviors, such as seeking early refills or reportedly selling prescription drugs.

Although Suetholz "denie[d] any violation" of Kentucky medical regulations, he agreed to several sanctions, including a three-month ban on prescribing controlled substances, a requirement to log his prescriptions when he resumed prescribing, and recurring review of his patient charts by the Board. Reviewers identified shortcomings in how Suetholz documented his medical decision-making related to prescribing controlled substances, noting that his patient charts lacked detail on the risk of opioid abuse and consideration of the results of urine drug screens. Following the order's requirements, Suetholz took remedial training courses to improve how he documented his medical decision-making. After Suetholz completed the Board's requirements, the Board released him from the order in August 2014.

But soon after, Suetholz's prescribing practices again deviated from professional standards for at least three patients: LP, DK, and WY.[1]

*LP*

Suetholz started prescribing controlled substances to LP in 2015. Rachelle Guenther, Suetholz's patient and LP's romantic partner, referred LP to Suetholz. Guenther informed Suetholz about LP's history of addiction to alcohol and heroin, including that LP had previously undergone addiction treatment. Nevertheless, Suetholz prescribed LP opioids for unspecified foot,

---

[1]Following the convention of the district court and the parties, we refer to Suetholz's patients whose prescriptions formed the basis of the charges by their initials.

back, mouth, and shoulder pain and benzodiazepines for reported panic attacks. In LP's patient record, Suetholz neither documented LP's addiction history, nor explained why LP's vague pain descriptions justified recurring prescriptions for opioids, nor elaborated a psychiatric justification for prescribing benzodiazepines.

In May and July 2018, LP tested negative for the benzodiazepines that Suetholz had prescribed. Such negative results are problematic because, if the patient is taking medication appropriately, urine should contain traces of the prescribed medications. Instead, these results indicated a risk that LP was dangerously overtaking medications and running out before the urine drug test. Yet Suetholz neither addressed the failed drug tests in LP's patient file nor altered LP's prescriptions. Soon after, in September 2018, Suetholz prescribed LP tramadol and alprazolam (generic Xanax). And he wrote a prescription for alprazolam in May 2019.

LP died of a heroin overdose in June 2019, and Guenther informed Suetholz about LP's death soon after.

*DK*

Despite learning that one of his patients had died of an opioid overdose, Suetholz continued prescribing dangerous controlled substances to patients who showed signs of drug abuse. One of those patients was DK.

During DK's initial visit to Suetholz's clinic, DK tested positive for benzodiazepines, yet DK's patient record contains no evidence that Suetholz screened DK for addiction issues. Suetholz instead prescribed DK benzodiazepines and proceeded to increase the prescription by a "shocking" amount (from 15 to 120 pills per prescription) in future visits. He also did not document why DK's reported generalized anxiety justified such a high dose of benzodiazepines instead of a lower dose or a less dangerous substance.

In February 2021, DK died of a drug overdose. Coincidentally, Suetholz served as the county coroner where DK died. His office concluded that the death resulted from a combination of opioids and the same benzodiazepine that Suetholz prescribed to DK.[2]

*WY*

Still, Suetholz did not reevaluate his dangerous prescribing practices. For patient WY, Suetholz wrote prescriptions for 80-milligram Oxycontin pills, "the strongest pill size that you can get in Oxycontin." Suetholz prescribed WY three of these pills per day, resulting in a "quite high" daily morphine milligram equivalent (MME) value of 360. Suetholz ignored WY's inconsistent urine drug tests, and he did not monitor WY's claimed chronic pain to justify his prescribing. And rather than order new imaging to diagnose WY's complaints of pain, Suetholz relied on 15-year-old imaging.

B.

A superseding indictment charged Suetholz with 25 counts of illegal distribution of controlled substances under 21 U.S.C. § 841. Each count was for a specific prescription—for opioids, benzodiazepines, or other controlled substances—that Suetholz wrote between September 2018 and August 2021. Among other patients' prescriptions, LP's, DK's, and WY's prescriptions formed the bases for the indictment.

After a five-day trial, the jury convicted Suetholz on 12 of the 25 counts—those that related to LP, DK, and WY. Suetholz moved for judgment of acquittal and for a new trial, which the district court denied. The district court then imposed a below-Guidelines sentence of twelve months and one day of imprisonment. This appeal followed.

---

[2]The government did not charge Suetholz with a resulting-in-death enhancement under 21 U.S.C. § 841.

II.

A.

Suetholz first argues that there was insufficient evidence for his convictions. A sufficiency-of-the-evidence challenge must fail if "a rational jury could have found the elements of the crime beyond a reasonable doubt." *United States v. Bertram*, 900 F.3d 743, 748 (6th Cir. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Suetholz's burden is "very heavy" because a court reviewing a sufficiency challenge "does not judge the credibility of witnesses or weigh evidence, and it draws all reasonable inferences in the government's favor." *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005).

His sufficiency challenge focuses on whether the government proved that he acted without a legitimate medical purpose and whether he did so with the knowledge that he was not prescribing in an "authorized" manner. Under § 841(a)(1), it is a crime to "knowingly or intentionally . . . distribute[] or dispense[] a controlled substance," "[e]xcept as authorized." A prescription for a controlled substance is authorized when it is made "for a legitimate medical purpose . . . in the usual course of . . . professional practice." 21 C.F.R. § 1306.04(a).

The Supreme Court interpreted these provisions in *Ruan v. United States*, addressing "the state of mind that the Government must prove to convict . . . doctors of violating [§ 841]." 597 U.S. 450, 454 (2022). The Court held "that the statute's 'knowingly or intentionally' *mens rea* applies to authorization." *Id.* In other words, "the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so." *Id.* Whether the defendant had such knowledge or intention turns on "objective criteria" about usual professional practice, such as "*accepted* limits" on prescribing. *Id.* at 467 (quoting *United States v. Moore*, 423 U.S. 122, 141–42 (1975)). Thus, "the more unreasonable a

defendant's asserted beliefs or misunderstandings are, especially as measured against objective criteria, the more likely the jury will find that the Government has carried its burden of proving knowledge." *Id.* (internal quotation marks and ellipsis omitted).

Since *Ruan*, we have held that the government may prove knowledge of lack of authorization through either direct or circumstantial evidence. *See, e.g.*, *United States v. Bauer*, 82 F.4th 522, 529 (6th Cir. 2023). Circumstantial evidence may include a defendant's failure to "adequately examine the patients, establish diagnoses, consider red flags, or attempt more conservative treatment options." *Id.* Similarly, evidence that a doctor ignored signs of addiction, failed to establish objective pain diagnoses, or failed to enforce "compliance measures" on his patients permits a jury to infer the doctor's knowledge that his prescribing was unauthorized. *United States v. Anderson*, 67 F.4th 755, 769 (6th Cir. 2023) (per curiam). Circumstantial evidence of knowledge of lack of authorization can also include expert testimony describing how far the defendant's practices deviated from the mainstream. *Bauer*, 82 F.4th at 529.

Here, the jury had ample evidence—both direct and circumstantial—to infer that Suetholz knew that his prescribing practices deviated from professional norms, such that he knew he was not prescribing in an "authorized" manner.

Start with the direct evidence. Several years before the charged prescriptions, Suetholz acknowledged the Kentucky Board of Medical Licensure's findings that his patient files lacked support for his prescription decisions, and he took remedial training to learn to comply with usual-course prescribing. And when investigators later scrutinized his prescriptions, Suetholz conceded that he was an "outlier" because he prescribes more opioids than other doctors do. He even characterized the amount of opioids he prescribed to WY as a "boatload."

The circumstantial evidence bolstered the direct evidence. The government's expert, Dr. Timothy Munzing, explained that usual professional practice requires doctors to take or refrain from certain actions before and while prescribing controlled substances. These requirements include: screening patients for addiction history; addressing reported drug diversion, such as patients selling medications; avoiding prescriptions of high doses of opioids; avoiding concurrent prescriptions of opioids and benzodiazepines; considering alternative pain-treatment options instead of prescribing opioids; and documenting consideration of these and other factors in patient files. Dr. Munzing analyzed several of Suetholz's patient files and described how Suetholz frequently and sharply departed from these standards. Indeed, Dr. Munzing's testimony illustrated that, for many prescriptions that formed the bases of Suetholz's counts of conviction, Suetholz continued prescribing controlled substances shortly after he was notified of failed drug tests.

Additional circumstantial evidence came in the form of Suetholz's responses (or lack thereof) to learning of his patients' drug abuse. For instance, after LP's death, Suetholz did not reconsider his prescriptions for other patients in light of their failed drug tests. And after DK's overdose death from a combination of opioids and benzodiazepines, Suetholz continued prescribing those drugs in dangerously high doses and combinations.

With this evidence, a rational jury could conclude that Suetholz knew that his prescriptions to LP, DK, and WY were beyond the bounds of usual professional practice. *See Bertram*, 900 F.3d at 748.

Suetholz's counterarguments are unpersuasive. First, he invokes his supposed good faith in deviating from prescribing norms. He claims the evidence shows that he was simply "treating his patients in the best way he knew how," that there was no evidence of "nefarious" motives on his part, and that he "cared about his patients with every fiber of his being." Thus, according to

Suetholz, the government could not have proved that he knowingly or intentionally distributed controlled substances outside the usual course of professional practice because the evidence showed that he "knowingly and intentionally prescribed medications to *help* his patients, which is exactly what a physician acting with a legitimate purpose does."

But a doctor can both subjectively believe that he is acting to help his patients and know that he was not "observ[ing] generally accepted medical practices." *Moore*, 423 U.S. at 126. Indeed, "bad-apple doctors" cannot "escape liability by claiming idiosyncratic views about their prescribing authority." *See Ruan*, 597 U.S. at 466. Rather, "the scope of a doctor's prescribing authority [is defined] by reference to *objective* criteria such as 'legitimate medical purpose' and 'usual course' of 'professional practice.'" *Id.* at 467 (emphasis added) (quoting 21 C.F.R. § 1306.04(a)). Suetholz knew what usual professional practice required. Instead of following those procedures, he failed to screen patients for addiction issues, ignored failed drug tests, did not evaluate or document claims of pain, prescribed substances in dangerously high doses and combinations, and took "no precautions" against "misuse" or "diversion" of the substances he prescribed. *Moore*, 423 U.S. at 142–43.

Further, Suetholz cannot override the jury's decision by claiming that his favored evidence should have been entitled to more weight than conflicting evidence. For example, he notes that he tried treatment options for his patients other than prescribing drugs, like recommending that DK and LP engage in exercise or coping strategies. But the jury could weigh that potentially exculpatory evidence against the ample inculpatory evidence that Suetholz knowingly prescribed controlled substances outside the bounds of usual professional practice. Relatedly, Suetholz argues that the opinions of his expert, Dr. Patrick Murphy, were entitled to more weight than they

received. But again, the jury could weigh conflicting evidence as it saw fit, and it is not our job to reweigh the evidence on appellate review.

We thus hold that a rational jury could have found the elements of the § 841 offenses beyond a reasonable doubt, so Suetholz's sufficiency-of-the-evidence challenge fails.

B.

Suetholz next challenges the district court's jury instruction on deliberate ignorance. At the government's request, the district court issued a nearly verbatim version of the Sixth Circuit's pattern instruction on deliberate ignorance. The given instruction allowed the jury to consider whether Suetholz "deliberately ignored a high probability that he was prescribing controlled substances outside the usual course of professional practice without a legitimate medical purpose" but did not allow the jury to convict for mere "[c]arelessness, or negligence, or foolishness." Because he preserved this claim by objecting to this instruction, we review for abuse of discretion. *United States v. Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012).

The use note to the pattern deliberate-ignorance instruction states that "[t]his instruction should be used only when there is some evidence of deliberate ignorance." Sixth Circuit Committee on Pattern Criminal Jury Instructions, Pattern Criminal Jury Instructions, Instruction 2.09 Deliberate Ignorance. Here, as the government persuasively argues in its brief (at 10–12), the instruction was appropriate because Suetholz repeatedly put his knowledge of the illegitimacy of his prescribing at issue, and evidence showed that he avoided learning the truth about his patients' red flags.

Part of Suetholz's defense at trial was that he did not know that his prescribing was improper because he lacked knowledge of the relevant facts. In opening, his attorney posited that Suetholz "did not believe the drug screens were problematic because he knew his patients, and he

talked to them, and he knew that they were taking their medications," and that LP was using heroin "unbeknownst" to him. Suetholz stuck to this theme when cross-examining the government's witnesses, for example, by asking Guenther whether LP was "hiding [LP's] addiction from [Guenther]." In closing, Suetholz's attorney argued that LP "hid . . . heroin use from everyone," including Suetholz.

Suetholz's patient files showed his lack of action to learn facts crucial to whether his prescriptions were appropriate or safe. For instance, the records show a lack of screening for addiction history and mental-health issues. Likewise, he failed to assess his patients' vague complaints of pain, anxiety, or other conditions—for example, by ordering or reviewing recent imaging of areas of claimed pain—to justify the doses or combinations of their prescriptions. And after LP, DK, and WY failed drug tests, Suetholz did not follow up, stopped testing them, and continued prescribing them controlled substances.

As for Suetholz's argument about whether the deliberate-ignorance instruction was appropriate post-*Ruan*, our recent decision in *United States v. Stanton*, 103 F.4th 1204 (6th Cir. 2024), is on point and controlling. There, we explained that a deliberate-ignorance instruction prevents "providers from claiming a lack of knowledge of illegal operations despite awareness of serial red flags." *Id.* at 1213. Like Suetholz, the defendant there argued that an instruction on deliberate ignorance conflicts with *Ruan*'s requirement that the government "prove that a doctor knowingly acted outside the authorized practice of medicine." *Id.* We rejected that argument, noting that "*Ruan* does not prevent the government from proving knowledge 'through circumstantial evidence.'" *Id.* (quoting *Ruan*, 597 U.S. at 467). We explained that the instruction is appropriate "only when" two conditions are met: (1) the trial record could support the inference that the defendant "avoid[ed] the consequences of his actions by closing his eyes to the obvious,"

and (2) the defendant "claims a lack of knowledge" about relevant facts. *Id.* at 1212–13. In those instances, a defendant's deliberate ignorance of those facts is appropriate "circumstantial evidence" of knowledge of unauthorized prescribing under *Ruan*. *Id.* at 1213. *Stanton* underscored, however, that a deliberate-ignorance instruction must "remind[] the jury that [the deliberate-ignorance] standard sits well above carelessness, negligence, and mistake." *Id.*

Here, as in *Stanton*, the conditions supporting the instruction's use were satisfied. Evidence suggested that Suetholz "close[ed] his eyes to the obvious" by, for instance, ignoring his patients' failed drug tests. *Id.* at 1212. And Suetholz "claimed a lack of knowledge" of facts that made his prescribing practices beyond the bounds of professional practice. *Id.* at 1213. Further, the district court appropriately used the Sixth Circuit pattern instruction, which warns against convicting on a lower negligence or carelessness standard. Thus, under *Stanton*, the deliberate-ignorance instruction here was proper, and the district court did not abuse its discretion by giving it.

C.

Suetholz next challenges various evidentiary rulings the district court made before and during his trial. Because Suetholz preserved these evidentiary claims, we review for abuse of discretion. *United States v. Miner*, 774 F.3d 336, 348 (6th Cir. 2014).

1.

Suetholz first challenges the admission of evidence about the investigation and sanctions of the Kentucky Board of Medical Licensure. He moved in limine to exclude evidence that the Board had investigated and sanctioned him in 2012. The district court declined to exclude evidence of this investigation, holding that it was admissible under two alternative theories: (1) as intrinsic or background evidence to the charged conduct, *see United States v. Hardy*, 228 F.3d 745,

748 (6th Cir. 2000), and (2) the knowledge exception under Federal Rule of Evidence 404(b)(2). Because we can affirm based on the district court's second theory alone, we do not address the first.

The district court did not abuse its discretion by admitting this evidence to prove knowledge, a valid purpose for admitting evidence of other crimes, wrongs, or acts under Rule 404(b)(2). The Board's investigation of and resulting sanctions for Suetholz demonstrated his knowledge of the medical standards applicable to patient records and prescription practices. This evidence was probative of whether Suetholz knew that his actions were outside the usual course of professional practice.

Consider the "Agreed Order of Indefinite Restriction" that resulted from the Board's investigation. By signing that order, Suetholz "acknowledge[d] and agree[d] that, based upon the Stipulations of Fact, the [Board] could find that [he] has engaged in conduct" that violated Kentucky rules that protect against patient harm. Those stipulations included that the Board had determined that Suetholz provided "inadequate documentation" of chronic pain that would "support the medical necessity of prescribing controlled substances." Suetholz also stipulated that he failed to address his patients' aberrant behaviors, such as their obtaining early refills of medications and reports that patients were possibly selling or stealing medications. In other words, that order put Suetholz on notice that his practices were outside the bounds of usual professional practice.

The order further required remedial training to bring Suetholz into compliance with usual professional practice. For instance, in a documentation course, he received feedback on "[m]ultiple improvements" needed in documenting his medical decision-making, such as needing to include opioid addiction on a patient's problem list.

Over the next six months, the Board's sanctions imparted Suetholz with even more knowledge through several rounds of chart review. In these assessments, reviewers told Suetholz that he needed to consistently include in his charting: "clinical reasoning" on patient assessments; "[d]etails about . . . current/past psychiatric diagnoses, illicit drug abuse, [and] family history for patients on chronic opioids"; a "[r]eview of opioid risk assessment [and] comments on risk of addiction/abuse"; and "documentation of [the] results of urine drug screens."

Beyond the Board's sanctions and actions, Suetholz's own admissions during the investigation showed his knowledge of usual-course prescribing practices. Suetholz acknowledged that the investigation had "been a learning tool for [him]" and that, going forward, he would use urine drug testing to screen patients for aberrant behaviors and to "correct any short comings [sic] [he] may have had in the past." He noted that urine drug testing was a "valuable tool" to address "possible medication abuse by [his] patients" and recounted dismissing a patient from his practice after she twice tested negative for opioids that Suetholz had prescribed her.

We thus hold that the district court did not abuse its discretion by admitting evidence of the Board's investigation and sanctions as probative of knowledge under Rule 404(b)(2).

2.

Suetholz next challenges the admission of evidence that two of his patients, LP and DK, died of overdoses. The district court rejected Suetholz's motion in limine to exclude evidence of those deaths under Federal Rule of Evidence 403. It admitted "targeted evidence" of the deaths because the deaths were "intertwined with the offenses charged." At the district court's direction to mitigate potential prejudice, the parties jointly submitted a limiting instruction, explaining that Suetholz was not charged with these deaths and that the jury could "only consider evidence of uncharged patient deaths to determine whether [Suetholz] knowingly or intentionally prescribed

controlled substances without a legitimate medical purpose outside the usual course of professional practice."

Under Rule 403, the district court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The district court has "broad discretion" to balance these interests. *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018). When the district court admits evidence over a party's Rule 403 objection, we review the evidence "in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *Id.* (internal quotation marks omitted).

The evidence of LP's and DK's deaths was probative of whether Suetholz's prescribing practices were outside of usual professional practice because it allowed the jury to assess what Suetholz did (or did not do) after learning of the deaths. As our sister circuits have held in similar cases, a doctor's failure to adjust dangerous prescribing practices after learning of a patient's overdose death can demonstrate that doctor's "wanton disregard for the drug-abusive tendencies of [his] patients," *United States v. Schwartz*, 702 F. App'x 748, 756 (10th Cir. 2017), and his knowledge "that his patients were misusing [their] prescriptions," *United States v. Bourlier*, 518 F. App'x 848, 855 (11th Cir. 2013) (per curiam). Here, evidence that Suetholz knew about his patients' deaths undercut his defense that he did not know about his patients' drug abuse. *Cf. United States v. Lang*, 717 F. App'x 523, 539 (6th Cir. 2017) (holding that questions to a nurse witness about her knowledge of the overdose death of one of her patients "were admissible to impeach [her] claim that her patients were legitimate"). And his failure to change his ways after his patients died—for example, by more closely screening patients for addiction history or more closely monitoring their opioid use—showed that his prescribing practices were beyond the pale. Moreover, because LP and DK were patients whose prescriptions supported several of the charged

counts, the fact that they died is "inextricably intertwined with the offenses charged." *Bourlier*, 518 F. App'x at 855. For example, it explains why Suetholz stopped treating them and why they were not witnesses at trial. *Id.*

And if this evidence created unfair prejudice, such prejudice did not substantially outweigh the evidence's probative value. The limiting instruction, approved by Suetholz's counsel, helped to mitigate any unfair prejudice. Indeed, that instruction was not only included in the jury instructions given at the end of trial but also recited by the district court to the jury before the government called its first witness.

Thus, the district court did not abuse its discretion by admitting the evidence of patient deaths.

3.

Suetholz next challenges the admission of testimony from the government's expert witness, Dr. Munzing. In support, he alleges Dr. Munzing made "perjured testimony" in another case. He asserts that the government "should not have been allowed to present an expert witness who had perjury allegations hanging over his head in another federal court."

But in his brief on appeal, Suetholz never specifies what the "perjured testimony" was, how it relates to this case, or which legal standard we should use to evaluate this claim. Suetholz thus forfeited this argument by failing to develop it. *United States v. Persaud*, 866 F.3d 371, 385 (6th Cir. 2017). Even after the government invoked forfeiture in its response brief, Suetholz made no further attempt to develop this argument in his reply. We thus decline to address this forfeited argument.

4.

The final evidentiary ruling Suetholz challenges is the exclusion of a hearsay recording of an interview with one of Suetholz's patients, WY. WY did not testify at trial. Apparently Suetholz had expected the government to call WY as a witness, but he later learned—during voir dire on September 6, 2022, when the government omitted WY from its list of potential witnesses—that it would not.

Suetholz, however, decided not to serve WY with a subpoena and compel WY's testimony during his case-in-chief. Instead, on September 11, 2022—two days before the trial's end—Suetholz moved to admit "unavailable witness testimony" under Federal Rule of Evidence 807. The testimony he sought to admit was a 49-minute audio recording of WY's interview with a government investigator. On the recording, "WY generally adopts a favorable opinion of Suetholz's prescribing practices."

Suetholz argued to the district court that WY was unavailable to testify because WY was so anxious that "he might engage in self-harm or suffer serious adverse health consequence" if he were to testify. To support that allegation, Suetholz submitted a declaration from his investigator, who spoke with WY on September 3 and heard WY state that "it would kill [WY]" to have to testify. The district court denied the motion because Suetholz did not show good cause for his delay in raising the issue.

Hearsay, an out of court statement offered for the truth of the matter asserted, is inadmissible unless an exception applies. Fed. R. Evid. 801, 802. Rule 807 permits the admission of hearsay where "the statement is supported by sufficient guarantees of trustworthiness" and "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a). Rule 807 also has an explicit notice

requirement: "[B]efore the trial," the proponent must "give[] an adverse party reasonable notice of the intent to offer the statement . . . so that the party has a fair opportunity to meet it . . . [unless] the court, for good cause, excuses a lack of earlier notice." Fed. R. Evid. 807(b).

Suetholz did not give notice before trial, and he has not shown good cause for his delay. His belated notice, given toward the end of trial, provided the government little time to assess the claim that WY was unavailable to testify or to have "a fair opportunity to meet" the evidence in the recording. *Id.* Suetholz knew the factual basis for his motion on September 3, three days before trial started and a week before he filed his motion. Even if he first expected the government to call WY, the government revealed on September 6 that it would not. By that time, Suetholz knew about WY's apprehension and anxiety, yet Suetholz waited five more days to notify the government of his intent to use the recording. He contends he did not give notice earlier because, "one week prior to trial, the trial court instructed the parties not to file any additional pre-trial motions." But Rule 807 does not require a motion; it requires only "reasonable notice" to the other party. *Id.* Thus, the district court did not abuse its discretion in barring this evidence because of lack of timely notice.

And even if Suetholz could justify his delay in giving notice, the recording would still be inadmissible. For Rule 807's hearsay exception to apply, a witness must first be found unavailable. *See United States v. Barlow*, 693 F.2d 954, 961 (6th Cir. 1982) (construing Rule 804(b)(5), the precursor to Rule 807); *see also United States v. Darwich*, 337 F.3d 645, 658–59 & n.17 (6th Cir. 2003). Under Rule 804(a)(4), a declarant is "unavailable" if he "cannot be present or testify at the trial or hearing because of death or a then-existing infirmity, physical illness, or mental illness." Suetholz never established that WY was unavailable to testify. Suetholz presented no evidence beyond his investigator's declaration to support the contention that WY was too anxious to testify.

Indeed, as the government explained to the district court, government investigators spoke with WY and found that WY "was calm, did not appear anxious, and simply indicated a desire not to participate." Consequently, the investigators found "no indication that W.Y.'s mental state was such that he should be deemed unavailable to testify."

We thus hold that the district court did not abuse its discretion by barring Suetholz from playing the hearsay recording for the jury.

D.

Suetholz next claims that he is entitled to a new trial because he could have presented more evidence to the jury attacking Dr. Munzing's credibility but for the government's alleged withholding of evidence in violation of the Jencks Act.

"[A] new trial based on newly discovered evidence" is a "disfavored" remedy. *United States v. Hawkins*, 969 F.2d 169, 175 (6th Cir. 1992) (per curiam). The "trial court's determination that a new trial is not warranted" on such grounds "will not be reversed absent a 'clear abuse of discretion.'" *Id.* (citation omitted). "To obtain a new trial based on newly discovered evidence, a defendant must establish," among other things, that "the evidence is material and not merely cumulative or impeaching" and "would likely produce an acquittal." *Id.*

After Suetholz's September 2022 trial, counsel for the government received a copy of a December 2020 opinion of an administrative law judge that discussed Dr. Munzing's testimony in a DEA proceeding. In that matter, Dr. Munzing testified for the government against Brenton Wynn, a California medical provider. The opinion paraphrased Dr. Munzing's testimony and noted that Wynn sometimes prescribed opioids at levels as high as 6,000 daily MME.

The government produced the opinion to Suetholz's attorneys shortly after receiving it. Suetholz then moved for a new trial based on this production. He contended that, had he known

about the opinion at trial, he would have cross-examined Dr. Munzing about the contrast between cases of doctors who prescribed up to 6,000 MME and the relatively lower MMEs at issue here. The district court denied Suetholz's motion.

The Jencks Act requires the disclosure of "statement[s]" by a government witness that are "in the possession of the United States." 18 U.S.C. § 3500(b). The Act defines a "statement" to include a written statement "adopted" by the witness or a transcription of an oral statement. *Id.* § 3500(e). Such statements must "relate[] to the subject matter as to which the witness has testified" in the instant proceeding. *Id.* § 3500(b). But "the government need not turn over collateral or background information"—such as generalized statements from an expert in prior cases. *United States v. Primm*, 63 F.4th 1186, 1191 (8th Cir. 2023).

For two reasons, it is unclear whether this ALJ opinion is a statement that needed to be disclosed under the Jencks Act. First, a preliminary requirement for disclosure is that the material be "in the possession of the United States," 18 U.S.C. § 3500(b), and the government asserts that it did not receive this opinion until after trial. But the government does not explain why it received this opinion so late—the *Wynn* opinion is dated December 30, 2020, and Suetholz's trial occurred over a year and a half later in September 2022. No doubt this opinion was in the possession of attorneys at the U.S. Department of Justice, given that it was a DEA proceeding, long before Suetholz's trial began. Second, the ALJ opinion is not clearly a "statement" by Dr. Munzing. The opinion was written by an ALJ, and it was not "adopted" by Dr. Munzing. *Id.* § 3500(e)(1). At times, however, the opinion appears to quote Dr. Munzing verbatim, providing citations to the hearing transcript. A quotation could be a "statement" under the Jencks Act because it is "a substantially verbatim recital of an oral statement made by said witness." *Id.* § 3500(e)(2).

But even assuming some or all of the opinion is covered by the Jencks Act and should have been disclosed earlier, its nondisclosure did not prejudice Suetholz such that he may obtain the disfavored remedy of a new trial. As shown by Suetholz's intended use of the ALJ opinion, the statements contained in the opinion were "merely cumulative or impeaching." *Hawkins*, 969 F.2d at 175. In other words, additional cross-examination questions based on the statements in the opinion would not have affected the trial's outcome. Although Suetholz speculates that questions about Wynn's 6,000 MME prescriptions would make Suetholz's 300 MME prescriptions look less egregious by comparison, such a comparison would not rebut evidence that 300 MME is still dangerous—particularly when given to patients who are not closely monitored.

Thus, the district court did not abuse its discretion by not granting a new trial because of the nondisclosure of this impeachment evidence.

E.

Finally, Suetholz argues that the cumulative effect of the errors he identified requires reversal. But because there were no errors, Suetholz "cannot establish any errors to cumulate." *United States v. Bankston*, 820 F.3d 215, 235 (6th Cir. 2016) (citation omitted). At most, Suetholz showed that the government belatedly disclosed impeachment evidence, but as just discussed, that belated disclosure did not prejudice Suetholz. Thus, it cannot give rise to cumulative error warranting a new trial. *See United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004).

III.

For these reasons, we affirm the district court's judgment.