RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0171p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

          *Plaintiff-Appellee*,

    *v.*

EVANN HERRELL (24-5498); MARK GRENKOSKI (24-5499 & 25-5017); KERI MCFARLANE (24-5664),

          *Defendants-Appellants*.

Nos. 24-5498/5499/5664/25-5017

─────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at London.
No. 6:21-cr-00013—Gregory F. Van Tatenhove, District Judge.

Argued: March 17, 2026

Decided and Filed: June 16, 2026

Before: MOORE, GIBBONS, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Loretta G. Cravens, ELDRIDGE & CRAVENS, P.C., Knoxville, Tennessee, for Appellant Herrell. Ashli Summer McKeivier, CHAPMAN LAW GROUP, Troy, Michigan, for Appellant Grenkoski. Brendan B. Gants, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Loretta G. Cravens, ELDRIDGE & CRAVENS, P.C., Knoxville, Tennessee, for Appellant Herrell. Ashli Summer McKeivier, CHAPMAN LAW GROUP, Troy, Michigan, Ronald W. Chapman II, CHAPMAN LAW GROUP, Detroit, Michigan, for Appellant Grenkoski. Richard L. Gaines, Knoxville, Tennessee, for Appellant McFarlane. Brendan B. Gants, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Charles P. Wisdom, Jr., Amanda Harris Huang, Gregory Rosenberg, Andrew E. Smith, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

---

**OPINION**

---

BLOOMEKATZ, Circuit Judge.  Evann Herrell, Mark Grenkoski, and Keri McFarlane were doctors at Express Health Care, a purported addiction treatment clinic which, in reality, operated as a "pill mill."  After a 30-day jury trial, all three were convicted on charges of conspiracy to distribute controlled substances, healthcare fraud, and money laundering.  In this joint appeal, the defendants bring numerous challenges to their convictions and sentences, including to evidentiary rulings, jury instructions, and the sufficiency of the evidence.  Because most of these challenges are meritless, and any errors that did occur were harmless, we affirm.

**BACKGROUND**

The defendants' appeal follows a jury trial, so we recite the facts in the light most favorable to the jury's verdict.  *See United States v. Reynolds*, 86 F.4th 332, 335 (6th Cir. 2023).

Express Health Care (EHC) opened in 2013 and advertised itself as a clinic designed to treat patients suffering from opioid addiction.  Evann Herrell, Mark Grenkoski, and Keri McFarlane were licensed doctors who were among the first to join EHC.  All three were "senior physicians," and Herrell and Grenkoski worked as the medical directors of the Harriman, TN, and Jacksboro, TN, locations, respectively.  Trial Tr. II, R. 1020, PageID 14264.

Though EHC held itself out as an addiction treatment clinic, in reality it functioned as a "pill mill."  EHC prescribed patients buprenorphine, an opiate and Schedule III controlled substance; benzodiazepines (or "benzos"), a Schedule IV controlled substance; Suboxone; and other drugs, some of which were also controlled substances.  EHC churned out high numbers of these prescriptions in exchange for cash, with little to no regard for what legitimate, individualized addiction counseling and treatment would have required.  Because EHC doctors were paid per patient, they were heavily incentivized to maintain these practices, earning substantially higher incomes than they did working in emergency rooms, despite working fewer hours.

Prescribing drugs is within the ordinary course of treatment for addiction clinics, but EHC's customs departed from those norms. Take, for example, a typical EHC counseling session. EHC doctors routinely wrote prescriptions after seeing patients for just a few minutes, or even as little as 45 seconds. Doctors wrote these prescriptions without proper screening and without seeing medical records from other providers. They did so even when patients tested negative for their previously prescribed drugs, when there were clear indications that patients were diverting (or selling, rather than using) their prescribed medications, and when the patients were visibly intoxicated. Sometimes, patients received prescriptions signed by doctors who were never present during their visits. These prescription practices were all in stark contrast to ordinary addiction treatment—and to EHC's own guidelines.

The types of prescriptions issued by EHC doctors also departed from ordinary treatment plans. McFarlane referred to EHC as a "three three three clinic," meaning that doctors prescribed three doses each of buprenorphine, benzodiazepines, and Neurontin per day. Trial Tr. IX, R. 1027, PageID 15904. That is far outside the bounds of normal addiction treatment. McFarlane herself "said that the greater medical community would consider it ridiculous." *Id.* Indeed, other doctors *did* consider the three-times-three practice, as well as EHC's other prescribing practices, to be ridiculous, as evidenced by expert testimony and testimony from former EHC doctors at trial.

EHC and its doctors additionally took steps to obscure these practices. Most brazenly, EHC personnel carefully monitored the percentage of patients designated as "chronic pain" patients to avoid both additional regulation on pain clinics and regulatory caps on the number of patients to whom doctors could prescribe buprenorphine for addiction treatment. As a result, EHC personnel arbitrarily shifted patients back and forth between the "chronic pain" and "addiction treatment" classifications, careful to keep the percentage of chronic pain patients at exactly 49.9%, since the threshold for additional pain clinic regulations was 50%. To conceal the fact that their visits were not professional grade, EHC doctors signed forms falsely documenting conversations and examinations with patients that never happened, including examinations that could not possibly have been performed with the tools available in EHC offices. They also regularly signed many prescriptions at one time, to be given out by other EHC

personnel, for patients they had not seen. Grenkoski even signed prescriptions on behalf of a provider at EHC who was specifically prohibited from prescribing controlled substances.

EHC's fraud did not stop at covering up their poor treatment practices. It submitted fraudulent claims to Medicare and ordered unnecessary drug tests for patients to receive more reimbursement money. For example, it frequently ordered two types of urine drug tests simultaneously for the same patient—both presumptive and confirmatory tests—even though confirmatory tests were more accurate and EHC would receive results from the two tests at the same time. It also signed off on standing orders for drug testing, under which every patient received the same drug screening process, regardless of individualized considerations. In other words, EHC frequently ordered unnecessarily duplicative tests for large numbers of patients without confirming whether any of them individually required testing at all. It then charged Medicare for the tests, even though it knew Medicare required an individualized justification for each drug test and such practices would not be reimbursed if EHC honestly reported its practices.

Despite admitting that she thought the clinic was a "pill mill," McFarlane stayed at EHC until 2016 because "[s]he had bills to pay." Trial Tr. X, R. 1028, PageID 16009–10, 16093. Herrell and Grenkoski continued working there until its closure in 2018. McFarlane cooperated with the FBI in its investigation, which eventually led to the arrests of the three defendants and many other doctors and employees at EHC. Most defendants pleaded guilty, leaving Herrell, Grenkoski, and McFarlane (alongside Stephen Cirelli, not a party to this appeal) as the sole EHC employees who went to trial.

After a 30-day jury trial, Herrell, Grenkoski, and McFarlane were each convicted of one count of conspiracy to distribute controlled substances, one count of conspiracy to falsify medical records, two counts of conspiracy to commit wire and health care fraud, and two counts of conspiracy to commit money laundering; McFarlane was also convicted of an additional count of money laundering. *See* 21 U.S.C. § 846; 18 U.S.C. §§ 2, 371, 1349, 1956(a)(1), 1956(h), 1957. Herrell was sentenced to 120 months' imprisonment. Grenkoski was sentenced to 108 months' imprisonment. And McFarlane was sentenced to 52 months' imprisonment. All three

defendants filed Federal Rule 29 motions for acquittal or for a new trial, which the district court denied.  *See* Fed. R. Crim. P. 29.

The defendants filed timely appeals.

**ANALYSIS**

Herrell, Grenkoski, and McFarlane challenge their convictions and sentences on numerous grounds.  *First*, all three defendants assert that the government proffered insufficient evidence to convict them on one or more counts.  *Second*, all three defendants challenge various evidentiary decisions made by the district court during the trial.  *Third*, McFarlane argues the district court abused its discretion by refusing to sever her trial from that of her co-defendants. *Fourth*, all three defendants challenge jury instructions related to *mens rea*, albeit in different ways.  *Fifth*, Grenkoski argues that the cumulative harm from any errors deprived him of a fair trial.  *Sixth*, Grenkoski contends that the district court erred by failing to reduce or correct his sentence.  We address each challenge in turn, ultimately concluding that none warrants disturbing the jury's verdict or the district court's sentencing.

## I.        Sufficiency of the Evidence

Herrell, Grenkoski, and McFarlane all contend that there was insufficient evidence to support one or more of their convictions.  Grenkoski challenges all of his convictions, while Herrell and McFarlane challenge only their convictions for conspiracy to unlawfully dispense controlled substances.  *See* 21 U.S.C. § 846.  We will sustain a criminal conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Elliott*, 876 F.3d 855, 863 (6th Cir. 2017) (quoting *United States v. Martinez*, 558 F.3d 301, 314 (6th Cir. 2009)).  The evidence against each defendant, presented over a 30-day trial, is too extensive to recount in full here, but even the abridged version we provide is sufficient to support these convictions.

A.        **Distributing Controlled Substances**

The jury found all three defendants guilty of conspiring to violate 21 U.S.C. § 841(a)(1), which makes it illegal for anyone to "knowingly or intentionally" distribute controlled substances unless these distributions are "authorized." Federal regulations allow for prescriptions for controlled substances to be "authorized" when they are made "for a legitimate medical purpose" and "in the usual course of [one's] professional practice." 21 C.F.R. § 1306.04(a) (2021). In *United States v. Ruan*, the Supreme Court clarified that for doctors to be convicted under this statute, they must have subjectively known that their prescriptions were not "authorized." 597 U.S. 450, 454 (2022). The defendants argue that the government failed to prove this knowledge element at trial through either direct or circumstantial evidence. *See United States v. Bauer*, 82 F.4th 522, 529 (6th Cir. 2023).

The jury heard ample evidence throughout the course of the 30-day trial demonstrating that EHC doctors, including the defendants, operated outside the usual course of professional practice. As described above, EHC's patient visits, prescribing habits, and documentation practices did not approach those of a legitimate medical treatment facility. Other factors reinforced the government's portrayal of EHC as a pill mill. For example, EHC lacked medical equipment, operated as a cash-only clinic, required patients to travel several hours to get there, and did not investigate to ensure patients were not diverting when they tested negative for their prescribed drugs. The individual defendants' behavior exemplified EHC's worst habits. For example, Herrell signed stacks of prescriptions for patients whom he had never seen and continued to do so even in the face of evidence that those patients were diverting their drugs. Grenkoski did the same. And not only did McFarlane do the same, but also she admitted she knew EHC was a "pill mill" and continued working there only because "[s]he had bills to pay." Trial Tr. X, R. 1028, PageID 16009–10, 16093.

Expert witnesses also testified that EHC's standard practices, including those engaged in by the defendants, did not approach the ordinary standard of care, thereby providing further justification for the jury's verdict. *See, e.g.*, *United States v. Anderson*, 67 F.4th 755, 769 (6th Cir. 2023) (per curiam). While the defendants presented evidence from their own expert witness,

"[i]t cannot be the case that a juror acts irrationally as a matter of law [if] he credits the testimony of one expert witness over another." *United States v. Persaud*, 866 F.3d 371, 381 (6th Cir. 2017).

We have previously upheld convictions in pill mill cases when the government presented evidence that the defendants prescribed drugs in abnormal doses and spent little time with their patients, as they "saw a full range of violations" and "contributed to many of them." *Elliott*, 876 F.3d at 865. We did the same when the government demonstrated the defendants' failures to "adequately examine [their] patients, establish diagnoses, consider red flags, or attempt more conservative treatment options." *Bauer*, 82 F.4th at 529. In fact, we have done so repeatedly in cases with inculpatory evidence similar to that presented by the government in this case. *See, e.g.*, *Anderson*, 67 F.4th at 769–70; *United States v. Suetholz*, No. 23-5613, 2024 WL 4182903, at *3–4 (6th Cir. Sep. 13, 2024); *Oppong v. United States*, No. 24-3246, 2025 WL 655542, at *8 (6th Cir. Feb. 28, 2025). Because all of these same factors—and more—describe EHC's typical practices and these defendant doctors, we uphold their convictions as well.

Moreover, because the defendants were charged with conspiracy and not the predicate controlled-substance crime itself, their convictions did "not turn on whether any one [of them] completed the underlying substantive crime." *United States v. Stanton*, 103 F.4th 1204, 1211 (6th Cir. 2024). Thus, a jury could have permissibly convicted any of these defendants so long as it found they "deliberately avoided learning of [EHC's] illicit practices" because they "knew about [its] unusual patient population, [its doctors'] lack of concern about drug testing, and other telltale signs of a pill mill." *Id.* at 1213. As we have already described, the defendants knew EHC shared many "telltale signs of a pill mill." *Id.* Therefore, any rational trier of fact could have found that the elements of the crime were satisfied beyond a reasonable doubt.

## B.     Health Care Fraud

Grenkoski also contests his conviction for conspiracy to commit health care fraud. *See* 18 U.S.C. §§ 1347, 1349. The government sought this conviction based on EHC's practices of ordering unnecessarily duplicative presumptive and confirmatory urine drug tests and signing off on "standing orders" for the same drug testing screening for all patients, as described above.

Because Medicare would not have reimbursed EHC for those practices, EHC secured reimbursements by knowingly omitting material facts, which suffices to establish health care fraud. *See United States v. Bertram*, 900 F.3d 743, 749 (6th Cir. 2018). The jury heard evidence that there was "no need" for the duplicative drug testing, Trial Tr. IX, R. 1027, PageID 15829, and that the practice provided "no benefit," Trial Tr. XVIII, R. 1036, PageID 17890. Thus, the evidence was sufficient to allow a jury to convict. *See Bertram*, 900 F.3d at 749–50. But even if it were not, Grenkoski did not challenge the "standing order" theory in his opening brief and has therefore forfeited any challenge to his conviction based on that theory. *See Scott v. First S. Nat'l Bank*, 936 F.3d 509, 522 (6th Cir. 2019).[1]

## II.     Evidentiary Rulings

We review most evidentiary rulings by the district court for abuse of discretion. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 378 (6th Cir. 2009). In doing so, we review questions of law de novo. *See id.* However, if a defendant did not object at trial, we review admission of that evidence for plain error. *United States v. Young*, 847 F.3d 328, 349 (6th Cir. 2017). Additionally, if the government can demonstrate "by a preponderance of the evidence" that a non-constitutional error "did not materially affect the verdict," then we will not disturb the verdict. *Id.* at 349–50. Applying these standards here, we consider the defendants' evidentiary challenges.

### A.     X-Waiver Elimination

Herrell and McFarlane appeal the district court's rulings regarding a federal regulation known as the "X-waiver rule." The X-waiver rule required doctors to obtain specific certification to prescribe buprenorphine and limited the number of patients to whom each certified doctor could prescribe. During the years of the conspiracy, the Drug Enforcement Agency (DEA) periodically raised these patient caps, allowing doctors to prescribe the drug to more patients. Then, in 2023—roughly five years after the end of the EHC

---

[1]Grenkoski finally contends that his remaining convictions must fall since they were based on his purportedly violating the Controlled Substances Act and committing health care fraud. But because the factual bases for both of those convictions were sufficient, this challenge fails, too. *Cf. Persaud*, 866 F.3d at 385.

conspiracy—the DEA repealed the caps entirely. The defendants argue that the rule's elimination shows their prescription practices were appropriate since the limits were misguided and eventually rejected.[2] Therefore, by their telling, this later elimination of the X-waiver rule was relevant to their states of mind during the conspiracy and was a necessary piece of the overall regulatory story.

Even assuming the rule's elimination clears the "low bar" of Rule 401 admissibility, *United States v. Wilder*, 87 F.4th 816, 819 (6th Cir. 2023) (quoting *United States v. Potter*, 927 F.3d 446, 452 (6th Cir. 2019)) (discussing Fed. R. Evid. 401), the district court did not abuse its discretion in rejecting evidence of the rule's elimination. *See* Fed. R. Evid. 403. The district court excluded this evidence because its admission could "really confuse[]" the jury. Trial Tr. XVI, R. 1034, PageID 17625. As the court explained, that the rule was subsequently repealed had no bearing on whether EHC doctors attempted to circumvent it during the conspiracy, which was the purpose of the government's introduction of the rule in the first place. The district court was concerned that the jury could "end up drawing an improper inference" given the long temporal gap between the end of the conspiracy in 2018 and the rule's elimination in 2023. *Id.* Instead, the court permitted the defendants to elicit testimony about how the caps were raised during the conspiracy, a fact much more relevant to the defendants' states of mind.

We explained in another pill mill case that, "[g]iven the timeline mismatch," guidelines issued just two years after the conspiracy ended had "little probative value." *United States v. Campbell*, 135 F.4th 376, 394 (6th Cir. 2025). Given the even greater "timeline mismatch" here, *id.*, as well as the fact that the jury heard about the changing nature of the regulations, the district court did not abuse its discretion by excluding evidence of the X-waiver rule's elimination.

Herrell's and McFarlane's remaining arguments about the X-waiver rule lack merit. Both contend that this evidentiary ruling deprived them of their right to present a complete defense. But the district court made rulings which were "correct legal applications of standard, justifiable rules of evidence," and the excluded evidence "would [not] have created a reasonable

---

[2]Notably, violating the X-waiver rule was "not in and of itself . . . per se a criminal act." Trial Tr. II, R. 1020, PageID 14424.

doubt as to [the defendants'] guilt," so the defendants were not deprived of that right. *United States v. Blackwell*, 459 F.3d 739, 756–57 (6th Cir. 2006). McFarlane also argues that the ruling violated the rule of completion, which allows an adverse party to introduce evidence to fill in an incomplete writing or statement. Fed. R. Evid. 106. But since she does not direct the panel's attention to any "writing or recorded statement" that the government introduced only in part, this argument fails. *Id.*

### B. Speculative Testimony

Grenkoski contests the admissibility of an exchange between the government and its witness, Dr. Matthew Rasberry, as violating Rules 401 (relevance) and 701 (opinion testimony by lay witnesses). *See* Fed. R. Evid. 401, 701. Dr. Rasberry, who pleaded guilty to drug charges himself, worked at EHC for several years and testified about its practices. During the government's questioning, Dr. Rasberry testified as follows:

GOVERNMENT:     Would you have written those illegal prescriptions if it were not for EHC?

DR. RASBERRY:     No, I would not have.

GOVERNMENT:     Why not?

DR. RASBERRY:     Because I approached it differently.

Trial Tr. II, R. 1020, PageID 14342–43. After this exchange, defense counsel objected, but the district court allowed the question and response, so we review for abuse of discretion.[3]

Dr. Rasberry's testimony easily clears the "low bar" required for Rule 401 relevance. *Wilder*, 87 F.4th at 819 (quoting *Potter*, 927 F.3d at 452). To convict for conspiracy to violate drug laws, *see* 18 U.S.C. § 846, the government was required to prove "an agreement to violate drug laws," *United States v. Caver*, 470 F.3d 220, 232 (6th Cir. 2006) (citation modified). If the jury credited Dr. Rasberry's testimony, it could reasonably conclude it was more likely that such an agreement existed at EHC since Dr. Rasberry testified that he violated the drug laws only

---

[3]The government contends that Grenkoski did not object at trial and so plain error review should apply. This contradicts the record. While the objection was lodged after the second question and response, and not to the initial question, the discussion between defense counsel and the district court makes it clear the objection was preserved.

because of his association with the clinic. Regardless of whether the questioning was probative of Grenkoski's state of mind, it was nevertheless probative of other facts which the government was required to prove, like the fact that an agreement to violate drug laws existed.

Dr. Rasberry's testimony was within the permissible scope for lay witness testimony under Rule 701, regardless of the speculative nature of the question. *See* Fed. R. Evid. 701. We have observed that when a witness testifies about whether they "would have acted differently if [they] had been aware of additional information," this is appropriate lay witness testimony. *United States v. Kerley*, 784 F.3d 327, 340 (6th Cir. 2015) (quoting *United States v. Cuti*, 720 F.3d 453, 460 (2d Cir. 2013)). Dr. Rasberry's testimony therefore falls within the permissible scope. Moreover, Dr. Rasberry had already testified that he over-prescribed in a "criminal" way because he was "following [EHC] guidelines that were set up." Trial Tr. II, R. 1020, PageID 14340. Rather than asking about a hypothetical set of facts, the objected-to line of questioning merely repeated that same testimony in a separate logical form: If he wrote illegal prescriptions only because he worked at EHC, then it follows that he would not have done so if he had not worked there.

## C. Hearsay Statements

Grenkoski challenges three hearsay rulings on appeal. Hearsay refers to out-of-court statements offered to prove the truth of the matter asserted in the statement. It is generally inadmissible. Fed R. Evid. 801(c), 802. But out-of-court statements admitted "'to show [their] effect on the listener'" or "why the listener acted as [they] did" are not hearsay, *United States v. Churn*, 800 F.3d 768, 776 (6th Cir. 2015) (quoting *Biegas*, 573 F.3d at 379), and are thus admissible so long as that purpose is relevant, *Gover v. Perry*, 698 F.3d 295, 306 (6th Cir. 2012). We review hearsay rulings de novo, *Biegas*, 573 F.3d at 378, asking whether the truth of the objected-to statements was relevant to "what the government was trying to show," *Churn*, 800 F.3d at 776.

*First*, the government elicited testimony from Amber Shillings, a former EHC employee, who discussed a conversation she had with a doctor who left EHC after one week on the job. During this testimony, she testified as follows:

| GOVERNMENT: | Why did you respect Dr. Franz? |
|---|---|
| SHILLINGS: | He was a very good doctor.  He was a very honest person.  [. . .] |
| GOVERNMENT: | How long did he work at EHC? |
| SHILLINGS: | I believe he worked one shift and he left. |
| GOVERNMENT: | One shift? |
| SHILLINGS: | Uh-huh (affirmatively). |
| GOVERNMENT: | Was that significant to you? |
| SHILLINGS: | Yes.  He told me that he didn't like—[Objection – Overruled.] |
| GOVERNMENT: | I believe you were going to explain to us why it was significant to you that Dr. Franz left after one shift? |
| SHILLINGS: | He told me that he did not—he did not like the way that their—like the way that they ran things down there, like that it was not okay. [. . .]  I quit.  I turned in my notice.  I told my husband that I was going to leave before the DEA come knocking on their door one day because I didn't want to be involved in it. |

Trial Tr. IV, R. 1022, PageID 14836–37, 14839–40.**[4]**

The district court admitted this evidence to show why *Shillings* left EHC, not for the truth as to why *Dr. Franz* left.  If Shillings left because she found Dr. Franz's statement that things were not okay at EHC believable and acted accordingly, this would have at least some "tendency" to show EHC doctors were acting in unauthorized ways, regardless of the truth as to why Dr. Franz left.  Fed. R. Evid. 401(a).  At the very least, that Shillings believed EHC engaged in unlawful activities is relevant to the existence of a broader criminal agreement, a necessary element of a conspiracy conviction.

---

**[4]**Aside from his hearsay objection, Grenkoski also argues that Shillings's testimony referring to Dr. Franz as an "honest" doctor constituted improper vouching.  *See United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999).  But when the "vouching" is made by a witness "and not the prosecutor," "the improper vouching doctrine . . . is not applicable."  *Taylor v. United States*, 985 F.2d 844, 846–47 (6th Cir. 1993).

Second, the government examined Julian Toms, a former counselor at EHC, and asked him if he had any concerns about the prescriptions issued at EHC. He answered in the affirmative:

TOMS:              Yes, I had a lot of concern because it was a known thing that there was a lot of diversion, which means people would get prescriptions, and then sell them under the table to their friends or family. So they would get prescriptions, and I had patients tell me that they had to sell their strips in order to pay for their visit. [Objection – Overruled.]

GOVERNMENT:       I think you were describing what some patients had explained to you regarding selling some of their prescriptions. Go ahead.

TOMS:              Correct. So I would counsel a patient, and a lot of times they would, you know, in having conversations with them, I come to find out they would admit that they were diverting their medications in order to make money to pay for their visit, or just to make money in general.

Trial Tr. V, R. 1023, PageID 14905, 14907. The government then asked how Toms reacted when he learned this information, and he responded that he "went to the doctor, told them about the diversion" and then "put it in [his] notes" in the patient's file. *Id.* at PageID 14907–08.

This testimony is relevant irrespective of whether these patients were telling Toms the truth. Their statements indicate that they felt comfortable telling an EHC counselor they were diverting their prescriptions, which is relevant to whether EHC was a pill mill in which doctors and patients knew such diversions occurred. *See Churn*, 800 F.3d at 776. Additionally, Toms's testimony that he added diversion information to his notes and alerted EHC doctors is relevant because (regardless of whether the patients' statements were ultimately true) it served as notice to the doctors of possible diversion. And when doctors continue to prescribe pills even when presented with evidence of possible diversion, that is circumstantial evidence of the required *mens rea. See, e.g.*, *Bauer*, 82 F.4th at 529; *Anderson*, 67 F.4th at 770.

*Third* and finally, the government asked John Hubbard, a former patient at EHC, if, while he visited EHC, he ever "hear[d] [other patients] talking about any kind of drug activity or illegal—" to which defense counsel quickly objected on hearsay grounds. Trial Tr. XIII, R.

1031, PageID 16826–27.  After the district court overruled this objection, Hubbard's testimony continued:

GOVERNMENT:    Did you hear any conversations like that?

HUBBARD:    Yes.

GOVERNMENT:    And did any of those conversations concern selling the prescriptions or the drugs?

HUBBARD:    Well, most of the time it was just, you know, trading for other narcotics.

*Id.* at PageID 16829.

Just as with Toms's testimony, Hubbard's testimony is relevant to whether the government's depiction of EHC as a pill mill was true regardless of whether patients told the truth about trading their prescriptions for other narcotics.  *See Churn*, 800 F.3d at 776.  Also, just as with Toms's testimony, these conversations should have prompted the doctors to take additional precautions and investigate possible diversion.  The fact that they did not do so is circumstantial evidence of their *mens rea*.  *Bauer*, 82 F.4th at 529; *Anderson*, 67 F.4th at 770.[5]

**D.    Text Messages**

Grenkoski next challenges the district court's admission of a series of text messages he alleges are unduly prejudicial.  These messages, between Herrell and an unidentified man, discuss the possibility of EHC being robbed at gunpoint, given the large amount of cash at the clinic.  The messages also describe contingency plans for such a robbery, including the fact that Herrell "carr[ies] a gun" and that the "first job" of the "girls" (EHC employees) working at the front desk was "to take a bullet."  Herrell Rule 29 Mot., R. 846, PageID 10914–15.  The district

---

[5]Although defense counsel did not request a limiting instruction for Shillings's or Toms's testimony, it did request one for Hubbard's testimony.  Yet the district court did not give one.  Limiting instructions should be given when requested to explain the permissible and impermissible purposes of a given piece of evidence.  *See* Fed. R. Evid. 105.  Therefore, it was likely error for the district court not to give a limiting instruction for Hubbard's testimony.  Because Grenkoski does not argue on appeal that the district court erred by not administering one, this issue is not properly before us.  *See, e.g.*, *United States v. Sherrill*, 972 F.3d 752, 763 n.1 (6th Cir. 2020).  But even if it were, there was strong evidence to support convicting Grenkoski, even without Hubbard's testimony, so any error was harmless.  *See United States v. Bell*, 516 F.3d 432, 447 (6th Cir. 2008).

court admitted these messages into evidence over objections based on Rules 401 (relevance) and 403 (unfair prejudice). *See* Fed. R. Evid. 401, 403.

Grenkoski agrees *arguendo* on appeal that the messages were relevant, so the only question remaining before us is whether any unfair prejudice substantially outweighs their probative value. Fed. R. Evid. 403. We review this question for abuse of discretion.

These messages are not so unfairly prejudicial as to require their exclusion. Grenkoski must show they "do more than 'paint[] the defendant in a bad light.'" *United States v. Clay*, 667 F.3d 689, 697 (6th Cir. 2012) (quoting *United States v. Sanders*, 95 F.3d 449, 453 (6th Cir. 1996)). He has not done so. While the messages do not endear us to Herrell, we cannot say that any unfair unsavoriness substantially outweighs the probative value of their content. Let alone that it was an abuse of discretion for the district court to admit them.

Neither of Grenkoski's arguments to the contrary is compelling. *First*, he argues that this evidence was unnecessarily cumulative since the government had already shown that the clinic primarily took cash payments and that its environment was unruly. While true, neither of those facts speaks to Herrell's state of mind in the same way his private descriptions of EHC do, so the text messages provided probative value that other evidence could not. *Second*, he argues that the texts relate only to Herrell, and not to him. But in a joint trial, it is "inevitable" that some evidence will relate to only one defendant. *United States v. Martinez*, 428 F.2d 86, 89–90 (6th Cir. 1970). Moreover, the district court properly instructed the jury to consider each defendant individually and not to impute evidence as to one defendant against another. *See id.*

### E.     Undisclosed Expert Testimony

Grenkoski challenges the admissibility of the lay testimony of Dr. Alexander Zotos, a physician who runs an addiction clinic in Tennessee. He argues that Dr. Zotos exceeded the permissible scope of lay witness testimony. *See* Fed. R. Evid. 701. Rule 701 forbids lay testimony from being "based on scientific, technical, or other specialized knowledge within the scope of Rule 702," which governs expert testimony. Fed. R. Evid. 701. Despite this, we have allowed treating physicians to testify as lay witnesses about "their first-hand observations and treatment" of patients, even when those observations necessarily touch on their areas of

expertise.  *United States v. Wells*, 211 F.3d 988, 998 (6th Cir. 2000).  But we have cautioned that this testimony is allowed only so long as the lay witness never gestures at "which practice is objectively *correct*."  *United States v. Betro*, 115 F.4th 429, 450–52 (6th Cir. 2024).

To be sure, the district court attempted to limit Dr. Zotos's testimony to its proper scope. Dr. Zotos was called to testify about an email he had sent to a group of addiction doctors that included Herrell.  At multiple points, the court sustained objections when it appeared as though Dr. Zotos might explain general principles of medicine and proper medical practice.  And it ensured the government pledged not to ask Dr. Zotos any hypothetical questions or questions about EHC's practices.  Despite this, Grenkoski contends that a few of Dr. Zotos's answers veered into impermissible expert testimony.

Even assuming that the district court let some expert testimony slip through, any error here was harmless.  Several witnesses—including multiple experts to whom the defendants did not object—testified that clinical practices typically look very different from those at EHC.  That evidence, coupled with the rest of the government's case, was strong even without the challenged testimony of Dr. Zotos. *See Bell*, 516 F.3d at 447.  So the concern that some of his testimony may have strayed into expert territory does not convince us to overturn the verdict.

F.      **Evidence of Patient Deaths**

Grenkoski next challenges the admission of a witness's passing reference to two deaths of unknown EHC patients.  The government asked EHC patient John Hubbard, "I think you'd talked about there were other folks you knew from your area that were going to EHC?"  Trial Tr. XIII, R. 1031, PageID 16834–35.  He replied, "Yeah.  Two people died and—" before being cut off by an objection from defense counsel.  *Id.*  After a lunch break, the district court ruled that evidence of patient deaths was admissible, but it limited that ruling to cover evidence of deaths only where the government showed "some connectivity between that information and these four defendants."  *Id.* at PageID 16843.

Grenkoski argues that the admission of such evidence was unduly prejudicial in violation of Rule 403, that the district court should have given a limiting instruction, and that it did not follow its own ruling requiring "connectivity."  *Id.*

We agree with the district court's decision to allow the testimony about patient deaths only if the government demonstrated a connection to the defendants. Other courts have ruled similarly. *See, e.g., United States v. Hofstetter*, No. 3:15-cr-27, 2019 WL 6718489, at *4–5 (E.D. Tenn. Dec. 9, 2019); *United States v. Schwartz*, 702 F. App'x 748, 756 (10th Cir. 2017); *United States v. Bourlier*, 518 F. App'x 848, 855 (11th Cir. 2013). We have done so as well, albeit in an unpublished opinion, reasoning that "a doctor's failure to adjust dangerous prescribing practices after learning of a patient's overdose death can demonstrate that doctor's 'wanton disregard for the drug-abusive tendencies of his patients'" and "his knowledge 'that his patients were misusing their prescriptions.'" *Suetholz*, 2024 WL 4182903, at *7 (first quoting *Schwartz*, 702 F. App'x at 756; then quoting *Bourlier*, 518 F. App'x at 855) (citation modified). We affirm that reasoning today, holding the district court did not abuse its discretion.

With respect to the two deaths mentioned by Hubbard, however, the district court did not follow its own ruling. Hubbard was immediately dismissed after the ruling. The government never connected his testimony about patient deaths to the defendants. And the district court did not give a limiting instruction.

Although we conclude that the district court erred in this regard, the error was harmless. Grenkoski does not contest on appeal the admission of evidence referencing a separate patient death at EHC, introduced later in the trial. After that evidence's admission, defense counsel explicitly declined a limiting instruction, perhaps reflecting a strategic decision. Thus, the jury's exposure to Hubbard's passing reference to separate patient deaths was largely cumulative and would not have "materially affect[ed]" the jury's verdict. *Young*, 847 F.3d at 349–50. Moreover, as we have already identified, the sum of the evidence against Grenkoski was strong, rendering any error harmless. *See Bell*, 516 F.3d at 447.

Grenkoski additionally argues on appeal that he was unable to "cross-examine a witness to meaningfully expound on the deaths to educate the jury." Grenkoski Br. at 61. But throughout the entire cross-examination of Hubbard, no one asked him to expand on his stray comment about the two deaths. Any inability to cross-examine about the deaths was therefore the fault of defense counsel.

In sum, while the district court may have made a couple of minor isolated evidentiary errors, those errors were immaterial in the context of the 30-day trial and extensive evidence against the defendants. Accordingly, we do not disturb the verdict.

## III. McFarlane's Motion to Sever

Before and during the trial, McFarlane moved to sever her trial from that of her co-defendants, in part because she was concerned about the prejudicial effect of "spillover evidence"—evidence that applied to one or more of her co-defendants, but not to her. A district court may sever one or more defendants from their co-defendants if a joint trial would "appear[] to prejudice a defendant." Fed. R. Crim. P. 14. We favor joint trials barring a showing of a high level of prejudice. *See United States v. Tocco*, 200 F.3d 401, 413 n.5 (6th Cir. 2000). The district court repeatedly denied McFarlane's motions. On appeal, she argues that the decision not to sever denied her a fair trial and asks us to order a new one. We review denials of motions to sever for abuse of discretion.[6] *United States v. Carnes*, 309 F.3d 950, 957 (6th Cir. 2002).

To prevail on appeal, a defendant must "show compelling, specific, and actual prejudice" resulting from the district court's denial of their motion to sever. *United States v. Medlock*, 792 F.3d 700, 711 (6th Cir. 2015) (citation modified). McFarlane has not done so. We have previously rejected appeals of denied motions to sever when they have relied on "generalized concerns" such as that "proof [was] greater against a codefendant," the defendant would have fared better in a separate trial, or "inflammatory evidence was admitted against one defendant," which did not involve a co-defendant. *United States v. Ledbetter*, 929 F.3d 338, 346 (6th Cir. 2019) (citation modified). McFarlane's concerns about spillover evidence largely sound in such "generalized concerns," *id.*, so the district court's denial of her motion to sever was not an abuse of discretion.

---

[6]The government argues that plain error review applies since McFarlane did not renew her motion at the close of trial. *See United States v. Fields*, 763 F.3d 443, 456 (6th Cir. 2014). While she did not renew the motion at the close of trial, doing so would have been futile. She renewed her motion so many times during the trial that the district court at one point joked it would "arrest" McFarlane's counsel due to the repeated renewals. Trial Tr. XXV, R. 1043, PageID 19170. Given McFarlane's persistence in raising severance before the district court, we doubt she forfeited this challenge by not raising it again at the close of trial. But because we affirm under either standard, we need not decide that question and assume that the abuse of discretion standard applies.

McFarlane's attempts to identify "specific" and "compelling" examples of "actual prejudice" do not sway us from this conclusion. *Medlock*, 792 F.3d at 711. *First*, she points to evidence regarding EHC's internal procedures and Tennessee state guidelines, which were instituted after she left the clinic. However, McFarlane was permitted to introduce evidence making it clear to the jury she was gone before those procedures and guidelines were written. And, anyway, the evidence of the national guidelines that EHC and its doctors violated, and which were in place while McFarlane worked there, is more probative of McFarlane's violation of federal law than are internal procedures or state guidelines.

*Second*, she argues that the text message exchange between Herrell and another individual about the possibility of a robbery was unduly prejudicial. Our general rule is that "inflammatory evidence" directed solely toward one defendant "does not, in and of itself, prove substantial prejudice in" a joint trial. *United States v. Sivils*, 960 F.2d 587, 595 (6th Cir. 1992) (quoting *United States v. Zalman*, 870 F.2d 1047, 1053 (6th Cir. 1989)). And the text exchange is not sufficiently prejudicial to require a separate trial. There is no reason to suspect the jury was incapable of distinguishing between the defendants, especially since McFarlane was not even included on the text chain.

*Third*, to the extent McFarlane argues the trial was too long and complicated for the jury to properly weigh the evidence against each defendant individually, we have previously endorsed much longer joint trials because trial length or complexity cannot alone require separate trials. *Tocco*, 200 F.3d at 413 n.5.

*Fourth* and finally, McFarlane argues that the fact that the jury ultimately found all four defendants guilty on all counts indicates it was unable to discern between each individual defendant's conduct. But a mixed verdict "is not essential" to our conclusion that a joint trial was appropriate. *United States v. Fischl*, 797 F.2d 306, 313 (6th Cir. 1986). Because none of McFarlane's proffered reasons are "compelling," "specific," and demonstrative of "actual prejudice," we affirm the district court. *Medlock*, 792 F.3d at 711.

## IV.     Jury Instructions

All three defendants challenge specific jury instructions on appeal.  Herrell and McFarlane object to the instructions on the elements of conspiracy to unlawfully distribute controlled substances.  *See* 21 U.S.C. § 846.  They claim the instructions failed to adequately explain the *mens rea* required for such a conviction.  Grenkoski objects to the instructions on deliberate indifference, which provides an alternative means for the government to prove *mens rea* on any count.  We find no error in either of the contested jury instructions.

We review challenges to jury instructions for abuse of discretion.  *Bauer*, 82 F.4th at 529. In doing so, we review "the legal accuracy" of those instructions de novo.  *United States v. Blanchard*, 618 F.3d 562, 571 (6th Cir. 2010).  Because the defendants argue the instructions here misstated the law, de novo review applies.

After *Ruan*, in order to sustain a conviction for violating 21 U.S.C. § 841(a),[7] the government "must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner."  597 U.S. at 457.  This standard is a subjective one, meaning it is not enough for the government to show a reasonable doctor would have realized they were acting in an unauthorized fashion.  *See Bauer*, 82 F.4th at 527 (interpreting *Ruan*).  The jury instructions relating to the defendants' *mens rea* therefore, viewed "as a whole," *id.* at 529, must tell the jury to convict only if the government demonstrated beyond a reasonable doubt that the defendants actually knew that EHC's prescriptions were not issued "for a legitimate medical purpose" while "acting in the usual course of [their] professional practice," *Ruan*, 597 U.S. at 454 (quoting 21 C.F.R. § 1306.04(a) (2021)).

### A.      Knowledge that the Prescriptions Were "Unauthorized"

In relevant part, the jury instructions told the jury they must find "beyond a reasonable doubt" that each defendant knew that their "prescriptions were not issued for a legitimate medical purpose by a practitioner acting within the usual course of professional practice."  Jury

---

[7]The defendants were convicted under 21 U.S.C. § 846, a conspiracy charge, but the predicate offense for their conviction was § 841.

Instructions, R. 747, PageID 8778.  At trial, the defendants requested supplemental instructions explicitly differentiating between general "standards of care" and the requirement that a prescription was unauthorized.  Specifically, they asked for the jury to be instructed that a showing that prescriptions were "unauthorized" imposes a higher burden than simply showing "malpractice or that a practitioner negligently, recklessly or foolishly failed to adhere to a standard of care."  Mot. for Supplemental Jury Instructions, R. 742, PageID 8745.  The district court denied this request as unnecessary and likely to confuse the jury.

In requiring the government to prove the defendants knew that their "prescriptions were not issued for a legitimate medical purpose by a practitioner acting within the usual course of professional practice," the jury instructions expressed the holding of *Ruan* nearly verbatim and are therefore acceptable.  Jury Instructions, R. 747, PageID 8778; *see Ruan*, 597 U.S. at 454; *see also United States v. Iwas*, No. 24-1234, 2025 WL 2955197, at *4–5 (6th Cir. Oct. 20, 2025) (upholding a jury instruction requiring the government to show "[t]hat the defendant knowingly or intentionally distributed an unauthorized prescription, that is, one not issued for a legitimate medical purpose in the usual course of professional practice.").

## B.        Deliberate Ignorance

The defendants also requested a modification of the deliberate ignorance jury instruction. Such an instruction does not tell the jury what the government must prove; rather, it informs the jury about "another way that knowledge may be proven."  *United States v. Mitchell*, 681 F.3d 867, 877 (6th Cir. 2012) (quoting *United States v. Severson*, 569 F.3d 683, 689 (7th Cir. 2009)). The defendants challenged two clauses in the deliberate ignorance instruction: that the jury could find the requisite knowledge if the defendants ignored a high probability that (1) the medical records contained false statements or (2) the prescriptions were "medically unnecessary."  The jury instruction read as follows:

> No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you are convinced that any of the defendants deliberately ignored a high probability that (1) controlled substances were distributed through prescriptions that were not issued for a legitimate medical purpose by a practitioner acting within the usual course of professional practice; (2) that medical records or "prior authorization" forms contained materially false statements; or (3) that

prescriptions for controlled substances or orders for urine drug testing were medically unnecessary, then you may find that that defendant knew that this was the case.

Jury Instructions, R. 747, PageID 8804. As relevant here, the defendants objected to clauses (2) and (3) above and requested that they be removed from the jury instruction.

Grenkoski argues that the district court erred by refusing to revise its jury instruction on deliberate ignorance because it referred to "medically unnecessary" urine drug testing rather than "unauthorized" prescriptions or drug tests. But this mistakes the purpose of the deliberate ignorance instruction. When considering convictions for health care fraud, with which Grenkoski was also charged, courts often consider whether there was evidence that the defendants knew treatments were not "medically necessary." *See, e.g.*, *Anderson*, 67 F.4th at 770–71; *Betro*, 115 F.4th at 444. The instruction merely told the jury one way it could find that the defendants possessed such knowledge. Thus, the instruction was appropriate.

To the extent Grenkoski contends that the instruction improperly separated knowledge from "carelessness, or negligence, or foolishness," in violation of *Ruan*, our precedents squarely foreclose this argument. We have repeatedly upheld this same instruction. *See Bauer*, 82 F.4th at 532–33; *Stanton*, 103 F.4th at 1213; *Anderson*, 67 F.4th at 766; *Campbell*, 135 F.4th at 387–88.

## V. Cumulative Error

Grenkoski additionally argues that the cumulative nature of the district court's individual errors requires reversal because their collective effect violated his due process rights. *See United States v. Warman*, 578 F.3d 320, 349 & n.4 (6th Cir. 2009). "To prevail under cumulative-error analysis, a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Underwood*, 859 F.3d 386, 395 (6th Cir. 2017) (citation modified). Grenkoski has identified, at most, three relatively small, isolated errors throughout the 30-day trial. Because their combined effects still do not demonstrate prejudice, especially in the face of the strong evidence against him, we reject this challenge, too.

**VI.     Motion to Correct or Reduce Sentence**

Finally, after sentencing, Grenkoski moved to correct or reduce his sentence under Rule 35, and the district court denied his motion on jurisdictional grounds.  Grenkoski challenges this denial.  A district court has jurisdiction to correct a sentence on a Rule 35 motion only within 14 days after the sentence is announced.  *See* Fed. R. Crim. P. 35(a); *United States v. Hall*, 661 F.3d 320, 322 (6th Cir. 2011).  Grenkoski did not even file his motion until the 14th day after the sentence was announced.  The district court then denied the motion after more than 14 days had passed, citing the jurisdictional bar.  Regardless of the fact that Grenkoski filed his motion before 14 days had passed, the district court's jurisdictional dismissal is correct.  *See Hall*, 661 F.3d at 323.  Therefore, we do not review his sentence.

**CONCLUSION**

For the reasons explained above, we affirm.